1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT
9              FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   SHANE MUDALIAR,                    Case No.  1:20-cv-01692-JLT-BAM

12              Plaintiff,

                                        **FINDINGS AND RECOMMENDATIONS**
13        v.                            **REGARDING PLAINTIFF'S MOTION FOR**
                                        **SUMMARY JUDGMENT**
14   LELAND DUDEK, Commissioner of Social
     Security,[1]                       (Docs. 17, 20.)
15

16              Defendant.

17

18

19                            __INTRODUCTION__

20        Plaintiff Shane Mudaliar ("Plaintiff") seeks judicial review of a final decision of the

21   Commissioner of Social Security ("Commissioner") denying his application for Supplemental

22   Security Income under Title XVI of the Social Security Act.  The parties' briefing on the motion was

23   submitted, without oral argument, to Magistrate Judge Barbara A. McAuliffe for findings and

24   recommendations.  (Docs. 17, 20.)  Having considered the parties' briefs, along with the entire record

25   in this case, the Court finds that the decision of the Administrative Law Judge ("ALJ") was supported

26

27   [1] Leland Dudek became the Commissioner of Social Security in February 2025.  Pursuant to Rule
     25(d) of the Federal Rules of Civil Procedure, Leland Dudek is substituted for Kilolo Kijakazi as
28   Defendant in this suit.

                                          1

by substantial evidence in the record and was based upon proper legal standards.  Accordingly, this Court will recommend affirming the agency's determination to deny benefits.

## FACTS AND PRIOR PROCEEDINGS

Plaintiff applied for Title XVI supplemental security income on October 18, 2016, alleging that he became disabled on December 31, 2013.  AR 210-18[2].  The claim was denied initially on May 8, 2017, and on reconsideration on August 3, 2017.  AR 125-30, 134-39.  Plaintiff requested a hearing before an administrative law judge ("ALJ") and ALJ E. Alis held a hearing on April 25, 2019.  AR 39-69.  ALJ Alis issued an order denying benefits on the basis that Plaintiff was not disabled on May 30, 2019.  AR 18-38.  Plaintiff sought review of the ALJ's decision, which the Appeals Council denied.  AR 7-12.  This appeal followed.

**April 25, 2019 Hearing Testimony**

ALJ Alis held a hearing on April 25, 2019.  AR 18-38.  Laurence Hughes, an impartial vocational expert, also appeared and testified.  AR 61-69.  Plaintiff's non-attorney representative Malinda Davies also appeared.  The ALJ began by admitting Exhibits 1A through 21F into evidence, with Plaintiff's representative confirming that Plaintiff had no objections.  AR 43.

Upon examination by the ALJ, Plaintiff testified that he was not currently working and last held a job five years prior when he worked at Foster Farm.  AR 45.  He said that he quit that job when his hands started hurting.  AR 46.  Plaintiff further testified that he did "some IHSS work" after his work at Forster Farm for approximately one year and had one client.  *Id.*  He said that in that job he babysat a four-year-old and a fourteen-year-old and he worked four hours per day, seven days per week.  AR 46-47.  Plaintiff additionally said that he had not tried to do other types of work, but he had applied to jobs as a mechanic and as a Mission Tortilla packager.  AR 47.  Plaintiff said that he had not applied for the packager job but was planning on turning his application in.  AR 47-48.  Plaintiff said that he was planning on applying for a mechanic job as he had gone to school for a mechanic job but needed insurance for it and did not know when he would apply to it.  AR 48.  Plaintiff said that he

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

2

1    did not do any volunteer work, but worked for his uncle at a real estate company where he would

2    repair houses.  AR 48-49.  In that role, he said he worked six hours per week and was paid seven to

3    eight dollars per hour.  AR 49-50.  Plaintiff testified that he did not do any volunteer work with

4    religious or community organizations.  AR 50.

5        Upon examination by his representative, Plaintiff testified that he lived with his mother, his

6    stepfather, and his 19-year-old younger brother.  *Id.*  Plaintiff said that he spent his time staying in his

7    room because there were "bad people outside."  AR 50-51.  He said that he would play video games

8    when he was in his room but that he could not concentrate on the games so he would play them for a

9    short time before taking a break.  AR 51.  He stated that when he would take a break from video

10   games, he would rest.  *Id.*  Plaintiff testified that he was sometimes tired during the day as he had

11   problems sleeping at night due to daily nightmares.  *Id.*  He stated that he would feel angry after his

12   nightmares, in which he would relive or react to childhood molestation he experienced.  AR 52.

13   Plaintiff testified that he did not have friends who he did things with, did not go to the movies, and did

14   not go to the mall.  *Id.*  He further said that he did not leave his house other than to go to the doctor.

15   AR 52-53.  Plaintiff stated that working with his uncle was his attempt to be outside of his house.  AR

16   53.  He testified that he heard voices and saw things, felt that he still had depression and was taking

17   medication for it, and was not getting counseling as he thought it would not work.  *Id.*  Plaintiff said

18   that he was offered counseling, went once with his mother, but felt that it would not help him.  AR 54.

19   He stated that he felt anxious and angry being in counseling and preferred being at home.  *Id.*

20       Regarding his physical problems, Plaintiff testified that he was still having problems with his

21   jaw as it would lock up and cause him pain.  *Id.*  He said that his jaw would lock up every day for over

22   an hour every time he ate.  AR 55.  When this happened, he said he was unable to concentrate and that

23   he would rest until it went away.  *Id.*  Plaintiff testified that he had infections in his teeth and that his

24   teeth were removed; that he had infections in his body; and had regular abdominal pain, nausea, and

25   vomiting.  AR 55-56.  He said that his eyes were still blurry even with glasses, that he could only read

26   large print for a short time before he became cross-eyed and could not focus.  AR 56.  He stated that

27   he also experienced headaches and eye pain.  AR 57.

28

3

1    Upon examination by the ALJ, Plaintiff said the he mainly stayed in his room, where he would

2    play video games for two to three hours before his eyes began hurting and he would be unable to

3    concentrate on the game.  AR 57.  The ALJ asked why Plaintiff believed he could not work despite

4    applying to different jobs and working with his uncle on home repair, and Plaintiff replied that he had

5    "a lot of problems" but said he "was gonna work."  AR 58.  Plaintiff said that he would work but that

6    it was hard to find work.  *Id.*  Plaintiff said that he was prescribed Zyprexa for his mental health from

7    his physical doctor, but that he had not seen a psychiatrist or mental health specialist yet.  *Id.*  Plaintiff

8    said that he did not drink alcohol, did not use non-prescription drugs, did not use marijuana, and did

9    smoke cigarettes.  AR 58-59.

10    Upon examination by his representative, Plaintiff said that he played video games a little bit

11    throughout the day adding up to two to three hours.  AR 59.   Plaintiff stated that he would not be able

12    to concentrate and see if he tried to play video games for two to three hours straight.  *Id.*  He said that

13    he did not get general relief, and that when he went out with his uncle he trusted his uncle "A little."

14    AR 60.  He said that if his uncle was not there, he would not be able to work five days a week, eight

15    hours per day and could not do everything on his own.  *Id.*  He added that if his uncle was not there, he

16    "could get hurt."  *Id.*

17    Following Plaintiff's testimony, the ALJ elicited testimony from vocational expert ("VE")

18    Laurence Hughes.  AR 61-69.  Plaintiff's representative did not object to the VE's qualifications, the

19    VE testified that he could give an impartial and neutral opinion in the case, the VE stated that he did

20    not discuss his testimony prior to the hearing, the VE said that he had reviewed Section E of Plaintiff's

21    file.  AR 61.  The VE stated that there were two past jobs but questioned if they should be included

22    given duration.  *Id.*  The VE classified the jobs as Child Monitor (DOT No. 301.677-010, SVP 3,

23    medium work in the DOT but light work as described) and Carpenter Helper (DOT No. 869.664-014,

24    SVP 4, heavy work in the DOT and heavy work as described).  AR 62.

25    The ALJ asked the VE hypothetical questions and asked the VE to assume an individual with

26    the same age, education, and work experience as Plaintiff who could perform work across all

27    exertional levels but would be limited to simple and routine tasks; could not do work at a production

28    rate or do jobs with high production quotas that need to be completed within strict time deadlines such

4

as on an assembly line; could occasionally interact with supervisors; could occasionally interact with coworkers; could not work in a tandem team or group setting; and could occasionally interact with the public but only on a superficial level, such as responding to greetings from customers or telling a customer how to get to the nearest restroom. *Id.* Regarding past work, the VE testified that the Child Monitor would not fit with the limitations, given the personal interaction, though the Carpenter Helper position would likely fit the limitations. AR 62-63. The VE said that his testimony was consistent with the DOT though he relied on his experience placing people in those jobs to form his opinion regarding frequency of public contact. AR 63.

For the second hypothetical, the ALJ asked the VE to consider an individual with the same limitations as the first hypothetical but added a limitation to light work and that the individual could lift or carry 20 pounds occasionally and 10 pounds frequently, but would have no limitations on standing, walking, or sitting. *Id.* The VE testified that such an individual could not do the carpenter helper position as that was a heavy job, though there were other jobs including: Photocopy Machine Operator (DOT No. 207.685- 014, SVP 2, light work, with 25,000 jobs nationally); Housekeeping Cleaner (DOT No. 323.687-014, SVP 2, light work, with 200,000 jobs nationally); and Press Operator, Laundry (DOT No. 363.685-010, SVP 2, light work, with 28,000 jobs nationally). AR 63-64. The VE said that his testimony was consistent with the DOT. AR 64. The VE said that the Housekeeping Cleaner position had no visual requirements, the Photocopy Machine Operator position required occasional near acuity, and the Press Operator position did not require near acuity. *Id.* The VE said that there was a Machine Tending position (DOT No. 363.685-022, with 40,000 jobs nationally) that would meet the other limitations and did not require near acuity. AR 65.

The ALJ asked what the maximum amount of time an individual could be off-task and remain employable, and the VE stated that there was no bright line but that five percent off-task time was generally acceptable while 10 percent off-task time would be a "maximum outside border." AR 65-66. The VE said that an individual who was off-task 15 percent of the workday two days per week could be employable, but that an individual who was consistently off-task 15 percent of the time would not be employable. AR 66. The VE clarified that, per his experience, there would be no work for someone who was off-task due to pain, visual impairment, or psychological impairment and unable

5

1    to work on a regular and consistent basis.  *Id.*  The VE further testified that there would be no work for

2    an individual who would be absent from work two days per month.  AR 67.  The VE further corrected

3    himself that there would be no past relevant work for the first hypothetical individual as the individual

4    was limited to simple and routine tasks but the Carpenter Helper position was semi-skilled.  *Id.*

5    Plaintiff's representative closed by noting that Plaintiff has mental and physical impairments,

6    including jaw pain, abdominal pain, nausea, and hallucinations, which prevent him from

7    concentrating.  *Id.*  Plaintiff's representative further noted that Plaintiff worked with his uncle on a

8    part-time basis to try to get out into the world and to function.  AR 68.

9        **Medical Record**

10       The relevant medical record was reviewed by the Court and will be referenced below as

11   necessary to this Court's decision.

12       **The ALJ's Decision**

13       Using the Social Security Administration's five-step sequential evaluation process, the ALJ

14   determined that Plaintiff was not disabled under the Social Security Act.  AR 18-38.  Specifically, the

15   ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of

16   August 26, 2016.  AR 23.  The ALJ identified the following severe impairments: temporomandibular

17   joint disorder (TMJ); depressive disorder; schizophrenia; anxiety disorder; and attention deficit

18   hyperactivity disorder (ADHD).  *Id.*  The ALJ also identified nonsevere impairments including dental

19   infections and abscesses, vision problems, and mental impairments.  AR 23-27.  The ALJ further

20   determined that Plaintiff did not have an impairment or combination of impairments that met or

21   medically equaled any of the listed impairments.  *Id.*

22       Based on a review of the entire record, the ALJ found that Plaintiff retained the residual

23   functional capacity ("RFC") to perform work across all exertional levels with the limitations that

24   Plaintiff: could perform simple and routine tasks; would have "no work at a production rate (no work

25   with high production quotas that need to be completed within strict time deadlines such as what you

26   might find on an assembly line)"; could occasionally interact with supervisors; could occasionally

27   interact with coworkers but not in a tandem, team, or group setting; and could "occasionally interact

28   with the public, but only on a superficial level (such as greeting customers or directing a customer on

6

how to get to the nearest restroom)." AR 27. The ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as "opinion evidence." *Id.*

The ALJ found that Plaintiff had no past relevant work, Plaintiff was defined as a younger individual on the application date, Plaintiff had a limited education and was able to communicate in English, and that transferability of job skills was not an issue because Plaintiff did not have past relevant work. AR 32. Given Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. AR 32-33. The ALJ noted that examples of jobs consistent with Plaintiff's age, education, work experience, and RFC included: (1) Photocopy Machine Operator (DOT No. 207.685-014, light, unskilled, 25,000 jobs available in the national economy); (2) Housekeeping Cleaner (DOT No. 323.687-014, light, unskilled, 200,000 jobs available in the national economy); (3) Press Operator, Laundry (DOT No. 363.685-010, light, unskilled, 28,000 jobs available in the national economy); and (4) Small Item Presser, Laundry (DOT No. 363.685-022, light, unskilled, with 40,000 jobs available in the national economy). AR 33. The ALJ therefore concluded that Plaintiff had not been disabled since the application date of August 26, 2016. *Id.*

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.,* *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's

determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). A claimant must show that he or she has a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

## DISCUSSION[3]

Plaintiff first argues that the ALJ failed to provide clear and convincing reasons for discounting Plaintiff's subjective symptoms. (Doc. 17 at 7-11.) Plaintiff also argues that the ALJ failed to evaluate the third-party witness statement from Plaintiff's mother. (*Id.* at 11-13.)

### A.    Plaintiff's Subjective Symptoms

Plaintiff contends that the ALJ committed harmful error by failing to provide clear and convincing reasons for rejecting Plaintiff's testimony as inconsistent with the evidence. (*Id.* at 7-11.) In deciding whether to admit a claimant's subjective complaints, the ALJ must engage in a two-step analysis. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Batson v. Comm'r*, 359 F.3d 1190, 1196 (9th Cir. 2004). First, the claimant must produce objective medical evidence of her impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014. If the claimant satisfies the first step and there is no evidence of malingering, the

---

[3] The parties are advised that this Court has carefully reviewed and considered all of the briefs, including arguments, points and authorities, declarations, and/or exhibits. Any omission of a reference to any specific argument or brief is not to be construed that the Court did not consider the argument or brief.

1    ALJ may reject the claimant's testimony regarding the severity of her symptoms only by offering

2    specific, clear and convincing reasons for doing so.  *Id.* at 1015.

3           Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be

4    expected to cause the alleged symptoms.  AR 28.  However, the ALJ discounted Plaintiff's statements

5    concerning the intensity, persistence, and limiting effects of those symptoms, noting that the

6    statements were not consistent with medical evidence and other evidence in the record.  *Id.*  The ALJ

7    was therefore required to provide specific, clear and convincing reasons for discounting Plaintiff's

8    subjective complaints.

9           First, the ALJ noted that "The record reflects a significant gap in the claimant's history of

10   treatment, which is not consistent with disabling levels of symptoms. He did not get treatment between

11   September 2014 and January 2015 (Exs. 4F, 9F)."  AR 29.  An ALJ may consider unexplained

12   treatment gaps in evaluating claimant symptoms testimony.  *See Roberts v. Berryhill*, 734 F. App'x

13   489, 491 (9th Cir. 2018) ("unexplained gaps in treatment may support an ALJ's credibility

14   determination."); *Marsh v. Colvin*, 792 F.3d 1170, 1173 n.2 (9th Cir. 2015) (finding gaps in treatment

15   regimen was permissible reason for discounting symptoms testimony); *Burch v. Barnhart*, 400 F.3d

16   676, 681 (9th Cir. 2005) (ALJ considering three or four month gap in treatment was permissible in

17   credibility determination).  Indeed, the record reflects that Plaintiff did not show up to a June 2014

18   appointment, was discharged from a behavioral health facility in July 2014, and did not return to seek

19   treatment of his mental impairments until February 2015.  *See* AR 473 (August 2014 Fresno County

20   Department of Behavioral Health Progress Note stating Plaintiff "was recently discharged from CBHC

21   on 7/25/14… [Plaintiff] was a 'no show' on 6/18/14 to complete his assessment at UCWC… Today

22   [Plaintiff] declined any mental health service with DBH."); AR 385 (February 2015 visit note

23   including Anxiety diagnosis, finding no acute distress in Plaintiff's general appearance, and stating

24   "Patient is here for medication refills and he is still awaiting to get a psychiatrist.")  This gap in

25   treatment was therefore a valid reason for discounting Plaintiff's symptoms testimony.

26          Plaintiff argues that Plaintiff's belief that treatment would not help is consistent with his

27   alleged symptoms and contends the ALJ failed to explain "why a 3-month period between

28   appointments… undermines Plaintiff's claim." (Doc. 17 at 8, 10.)  However, the ALJ stated that the

"significant gap" in treatment was "not consistent with disabling levels of symptoms."  AR 29.

Additionally, though Plaintiff testified that he was not getting further counseling as he felt it would not help and he became anxious and angry during counseling (AR 53-54), the evidence is also susceptible to the ALJ's interpretation that the gap was inconsistent with disabling symptoms.  The Court must therefore defer to the ALJ's conclusion.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) ("Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld.") (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir.1999)).  Plaintiff's arguments that the ALJ improperly examined a gap in treatment as part of discounting Plaintiff's symptoms testimony are therefore unavailing.

Second, the ALJ found that Plaintiff's allegations were not fully consistent with the medical and other evidence, contrasting Plaintiff's alleged impairments and symptoms with evidence from the medical record.  AR 27-28, 28-31.  Although lack of supporting medical evidence cannot form the sole basis for discounting testimony, it is a factor that the ALJ can consider.  *See Burch*, 400 F.3d at 681 (9th Cir. 2005).

Here, the ALJ contrasted Plaintiff's allegations with the objective findings in part as follows:

> Although the claimant alleged an onset date of December 2013, he did not seek out mental health treatment until June 2014. At this time, the claimant complained of nightmares due to being sexually abused as a child. His mother reported that he was angry, impulsive, had auditory hallucinations and engaged in self-harm. The claimant said that he last drank alcohol seven years prior and last smoked marijuana three weeks before. He failed to appear for his next appointment and thus was discharged from care in July 2014 (Ex. 9F). The medical record is then silent until February 2015 when the claimant presented to his primary physician requesting a medication refill while he awaited obtaining a psychiatrist. He was diagnosed with anxiety and provided a prescription for Zyprexa. The following month, it was noted the claimant was using marijuana daily. Psychiatric examination was positive for anxiety, depression, irritability and poor concentration. He presented as disheveled. No abnormal involuntary movements were noted. The claimant appeared guarded and was hesitant to make eye contact. He did not show any catatonic or conversion signs. The claimant's speech was low with decreased productivity and tone. His affect was appropriate. A diagnosis of schizophrenia was provided. In May 2015, the claimant denied experiencing hallucinations. He was prescribed alprazolam for

anxiety. The claimant was instructed to follow up with psychiatry. The following month, Zyprexa and alprazolam were refilled. At this visit, he was diagnosed with depressive disorder. The claimant was seen for medication refills in July, August and December 2015 (Ex. 4F).

In March 2016, his mother told the doctor that she was concerned about his mood swings and violent tendencies. The claimant said that his jaw pain was the cause of his mood swings (Ex. 4F). In June and September 2016, his psychiatric medications were refilled. Psychiatric examination in November 2016 was negative for anxiety, depression, sleep disturbance, irritability, mood swings or suicidal thoughts. At this time, the claimant was appropriately dressed and did not appear anxious or withdrawn. Speech and affect were appropriate (Ex. 8F). During an ophthalmological evaluation later in the month, his mood and affect was described as normal (Ex. lF). Psychiatric examination in December 2016 showed appropriate speech and affect. The claimant was appropriately dressed and did not appear anxious or withdrawn. In February 2017, his insight and judgment was good. The claimant had normal mood, affect and memory (Ex. 13F). In March and May 2017, the claimant denied experiencing anxiety or depression (Ex. 20F). In July 2017, his prescription for Zyprexa was refilled (Ex. 15F). Psychiatric examination in April 2018 revealed appropriate speech and affect. In addition, the claimant was appropriately dressed and did not appear anxious or withdrawn (Ex. 19F)…

In December 2015, claimant was diagnosed with TMJ. In March 2016, the claimant was seen with ongoing complaints of jaw and face pain. Since x-rays were normal a MRI of his TMJ was ordered. In addition, he was prescribed ibuprofen 600 milligrams. Later in the month, the claimant was prescribed a muscle relaxer and was referred to oral surgery. At this time, he was not in acute distress (Ex. 4F). TMJ MRI showed mild degenerative changes involving the mandibular condylar heads suggesting early osteoarthritis. In June 2016, the claimant was tried on tricyclic antidepressants to treat his TMJ. He was re-referred to oral surgery in September 2016 (Ex. 8F). In March 2017, he reported ongoing issues with TMJ. However, the claimant had only seen a dentist and had yet to have an evaluation with an oral surgeon. Examination did not reveal any limitation of movement of the TMJ, tenderness, dislocation on opening jaw or pain with range of motion. In May 2017, he was seen for ongoing issues associated with TMJ. It was noted that all of the claimant's teeth had been extracted and had a large under bite. He was again referred to oral surgery (Ex. l SF). The claimant continued to experience severe TMJ issues and abnormal operation as well as dislocation of the joint with mandibular motion in October 2018. He was again referred to oral surgery (Ex. 19F).

The claimant took part in an internal medicine consultative evaluation with Rustom Damania, MD in February 2017. He gave a history of bilateral TMJ dislocation and a loss of all his teeth. The claimant also stated that he had glaucoma bilaterally and a history of infections in both groin axillae. Examination revealed lack of upper and lower teeth. The mandibles seem to be well aligned, but he had difficulty fully opening his mouth. Strength was full in all extremities and sensation was grossly intact. His gait was within normal limits. The claimant was diagnosed with bilateral TMJ dysfunction, endentulous and possible bilateral hidradenitis in the groin and axillae that had resolved.

AR 29-31. The ALJ therefore properly discounted Plaintiff's symptoms testimony by contrasting Plaintiff's allegations of disabling symptoms with medical evidence suggesting that Plaintiff's TMJ and mental impairments produced relatively normal findings. *See* AR 358 (March 2016 exam noting that Plaintiff did not appear to be in acute distress while "TMJ shows marked popping on opening jaw."); 491 (February 2019 evaluation report noting "Mouth and Throat: The claimant has no upper or lower teeth. The mandibles seem to be well-aligned but he had difficulty fully opening his mouth."); AR 419 (November 2016 report finding "Psychiatric: Appropriately dressed. Does not appear anxious or withdrawn. Speech and affect are appropriate. Neurologic: Alert, oriented x3. No gross abnormalities noted."); 505 (February 2017 report noting psychiatric findings of "Insight: good judgment. Mental Status: normal mood and affect and active and alert. Memory: recent memory normal and remote memory normal.").

Plaintiff argues, citing Ninth Circuit authority, that "providing a summary of medical evidence ... is not the same as providing clear and convincing reasons for finding the claimant's symptom testimony not credible." *Lambert v. Saul*, 980 F.3d 1266, 1278 (9th Cir. 2020) (quoting *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015)). However, in the same case, the Ninth Circuit held that its "cases do not require ALJs to perform a line-by-line exegesis of the claimant's testimony, nor do they require ALJs to draft dissertations when denying benefits." *Id.* at 1277. Moreover, the ALJ here did not merely provide a summary of the medical evidence. Instead, the ALJ first explained Plaintiff's alleged symptoms and impairments, then contrasted those allegations with evidence from the medical record. AR 27-28, 28-31. Unlike in *Lambert*, the ALJ here detailed Plaintiff's symptoms testimony, then compared that testimony with opposing medical evidence. *See Lambert*, 980 F.3d at

1277 (""We cannot review whether the ALJ provided specific, clear, and convincing reasons for rejecting [claimant's] pain testimony where, as here, the ALJ never identified *which* testimony she found not credible, and never explained *which* evidence contradicted that testimony.") (quoting *Brown-Hunter*, 806 F.3d at 494).  The identification of specific allegations and evidence contradicting those allegations permitted the Court to review the ALJ's reasoning.  Plaintiff's argument is therefore unavailing.

Third, the ALJ noted that Plaintiff "described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  AR 29.  An ALJ may properly discount a claimant's subjective complaints when the daily activities demonstrate an inconsistency between what the claimant can do and the degree that disability is alleged.  *Molina v. Astrue*, 674 F.3d 1104, 1112–13 (9th Cir. 2012) (an ALJ may consider "whether the claimant engages in daily activities inconsistent with the alleged symptoms"), superseded by regulation on other grounds.  Even where a plaintiff's activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.  *Id*. at 1113.

Plaintiff contends that the ALJ improperly discounted Plaintiff's testimony based upon his daily activities despite his testimony that he only performed minimal daily activities.  (Doc. 17 at 9-10.)  Indeed, the Ninth Circuit has cautioned that a claimant's ability to complete minimal daily activities does not detract from the claimant's credibility.  *See Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) ("evidence that [claimant] could assist with some household chores was not determinative of disability. 'Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.') (quoting *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981)); *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.")

Here, the ALJ noted:

1
2
3
4
5

> As mentioned earlier, the record reflects work activity after the alleged
> onset date. Although that work activity did not constitute disqualifying
> substantial gainful activity, it does indicate that the claimant's daily
> activities have, at least at times, been somewhat greater than the
> claimant has generally reported. Further, the claimant testified that he
> was seeking employment and had an application that he was going to be
> submitting in the near future which indicates that he has some belief that
> he can be employed…

6
7
8
9
10
11
12

> He testified that he spent two to three hours a day playing video games
> with intermittent breaks, which necessarily requires some ability to
> maintain concentration, persistence and pace. In March 2017, the
> claimant told the psychological consultative evaluator that he was
> working on his car when someone ran up and hit him resulting in a
> broken jaw. He did not need help with bathing, dressing or grooming.
> The claimant was noted to be able to travel alone. He was able to
> prepare his own meals. He said that a typical day consisted of primarily
> staying at home, watching television, playing video games and taking
> naps (Ex. 14F).

13
14
15
16
17
18
19
20
21
22

AR 29.  However, some of the activities – such as bathing, dressing, grooming, and traveling alone – are the types of activities that the Ninth Circuit has cautioned against using to discount symptoms testimony.  *See Vertigan*, 260 F.3d at 1050.  Moreover, the ALJ utilized Plaintiff's playing video games with intermittent breaks as demonstrating his ability to maintain concentration, persistence, and pace.  AR 29.  But Plaintiff testified that he would only play video games "a little bit throughout the day" adding up to two to three hours, and that he would not be able to concentrate if he tried to play video games for two to three hours straight.  AR 59.  The ALJ therefore erred in using Plaintiff's daily activities to discount Plaintiff's symptoms testimony.  Nevertheless, this is harmless error as the ALJ also discounted Plaintiff's symptoms testimony based upon a gap in treatment and the objective medical evidence.

23
24

Accordingly, the ALJ appropriately discounted Plaintiff's symptoms testimony based upon the objective medical evidence and gap in treatment.

25

**B.  Evaluation of Pushpa Mudahiar's Statement**

26
27
28

Plaintiff next argues that the ALJ failed to properly evaluate the statement of Plaintiff's mother, Puspha Mudahiar.  (Doc. 17 at 11-13.)  "In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Bruce v. Astrue*,

557 F.3d 1113, 1115 (9th Cir. 2009) (quotation omitted). "[L]ay testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence ... and therefore *cannot* be disregarded without comment." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006)). "[I]n order to discount competent lay witness testimony, the ALJ 'must give reasons that are germane to each witness.'" *Molina*, 674 F.3d at 1114 (citation omitted).

In February 2019, Ms. Mudahiar wrote:

> I, Pushpa Mudahiar, Shane's mom like to tell you Shane's jaw broken. The Dr's trying to find a specialist for 4 yrs. Didn't found yet. He has no teeth can't wear dentures. He is still in Dr's care (Dr. Rainwater Greg) don't know what's going on in Shane's body. He get depress, frustrated, Anxiety, sometimes Shane gets panic disorder like chest pain, can't breath. 2 times already call ambulance for Shane, when his there (hospital) for 6,7 hours then he panic's wants to come home. Shane when he sleeps he see bad dream's, uneasiness, he won't stay still, shortness of breath, dry mouth, Nausea, muscle spasm and dizziness. Can't get relief then gets mad and throw things on loudly takes humming sound. Too many things going on with him. In '03 or '04 his ankle got cut with grinder while fixing car at home (deep cut) since now having problem standing or walking, sometimes the ankle gets swollen and pain. I hope judge will have mercy on my son Shane.

AR 312. In addressing the statement, the ALJ stated:

> Pushpa Mudahiar, the claimant's mother authored a letter in 2019. She said that her son's jaw was broken and that they had been trying to find a specialist for four years. Mrs. Mudahiar reported that the claimant has no teeth and is unable to wear dentures. She stated that her son gets depressed, frustrated, has anxiety and occasionally experiences panic attacks. Mrs. Mudahiar said that the claimant has nightmares as well. She said that her son has problems standing and walking due to ankle swelling that was the result of a deep cut sustained in 2003 or 2004 (Ex. 17E).
>
> This statement has been given little weight, as it is a lay opinion based upon casual observation, rather than objective medical examination and testing. Further, it is outweighed by the accumulated medical evidence regarding the extent to which the claimant's impairments limit his functional abilities. Ultimately, this statement is not persuasive for the same reasons set forth above in finding the claimant's allegations to be less than wholly supportable.

AR 32.

15

The ALJ considered Ms. Mudahiar's report and assigned it "little weight" as it was based upon casual observation and was outweighed by other medical evidence.  AR 32.  As the ALJ provided germane reasons for rejecting Ms. Mudahiar's report, the ALJ did not err in granting little weight to Ms. Mudahiar's report.  *See Molina*, 674 F.3d at 1114.  Further, there is no indication from the ALJ's opinion that he rejected or failed to consider her statement.  Rather, the ALJ granted it limited weight due to the substance of the opinion.

Plaintiff argues that the ALJ incorrectly rejected Ms. Mudahiar's statement as it was a lay opinion rather than an objective medical assessment, citing caselaw suggesting that lack of medical training is not a germane reason to discredit lay testimony.  (Doc. 17 at 13); *See Hurtado v. Colvin*, No. 16-CV-01075 NC, 2017 WL 373068, at *5 (N.D. Cal. Jan. 26, 2017) ("Here, the ALJ gave a number of non-germane reasons for giving minimal weight to the lay witness statements; namely, accusing [claimant's] mother and neighbor of bias, and questioning the accuracy of their statements because they are not medically trained.").  However, the ALJ did not discredit the statement based upon Ms. Mudahiar's lack of medical training or credentials, but instead discounted it because the statement was based upon "casual observation" rather than "objective medical examination and testing" as well as contradiction by the broader medical record.  AR 32.  Indeed, in a case cited by Plaintiff, the court held that there was no error where the ALJ discounted a mother's statement because it was not consistent with the broader medical record.  *See Hurtado,* 2017 WL 373068, at *5 ("However, the ALJ also noted that their statements were not consistent with the 'preponderance of the opinions and observations by medical doctors in this case.' This is a germane reason for rejecting the statements.").  As the ALJ did not discount Ms. Mudahiar's statement simply because she was not a medical expert, Plaintiff's argument misreads the ALJ's decision and is unsuccessful.

Plaintiff also argues that the ALJ was not sufficiently specific in explaining why the statement was discounted, citing *Talley v. Astrue* and caselaw from outside this district.  (Doc. 17 at 13); *See Talley v. Astrue*, 400 F. App'x 167, 169 (9th Cir. 2010); *Seaman v. Berryhill*, No. 4:16-CV-00027-SLG, 2017 WL 3879084, at *7 (D. Alaska Sept. 5, 2017) ("A conclusory statement that an opinion is not supported by the record or medical evidence does not suffice.").  However, in *Talley*, the Ninth

1    Circuit noted that the ALJ's decision "did not account for or give a reason for discounting the

2    testimony of" the "other source."  *Talley*, 400 F. App'x at 169.  Instead, the ALJ described Ms.

3    Mudahiar's statement and explained that it was not based on objective medical examination and

4    testing, was "outweighed by the accumulated medical evidence regarding the extent to which the

5    claimant's impairments limit his functional abilities," and was "not persuasive for the same reasons set

6    forth above in finding the claimant's allegations to be less than wholly supportable."  AR 32.

7    Additionally, while the ALJ's reasoning may at first glance appear conclusory, the ALJ avoided

8    unnecessary repetition by pointing to the symptoms testimony analysis in the preceding pages of the

9    decision.  *Id.*  As Ms. Mudahiar's reporting was largely duplicative of Plaintiff's own symptoms

10   testimony, the ALJ stating that the statement is "not persuasive for the same reasons set forth above in

11   finding the claimant's allegations to be less than wholly supportable" is sufficient.  *Id.*  Plaintiff's

12   argument that the ALJ's was insufficiently specific in discounting Ms. Mudahiar's statement is

13   therefore unavailing.

14        Accordingly, the ALJ appropriately discounted Ms. Mudahiar's statement.

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

17

**CONCLUSION AND RECOMMENDATION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, IT IS HEREBY RECOMMENDED as follows:

1.    Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be denied; and

2.    The Clerk of this Court be directed to enter judgment in favor of Defendant Leland Dudek, Acting Commissioner of Social Security, and against Plaintiff Shane Mudaliar.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, as required by 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these findings and recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that the failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **April 10, 2025**                     /s/ *Barbara A. McAuliffe*

                                        UNITED STATES MAGISTRATE JUDGE